| | |
|---|---|
| **SA'ADOON ALI HAMEED AL-OGAIDI**<br>Baghdad, Iraq<br><br>Plaintiff<br><br>v.<br><br>**DANIEL E. JOHNSON**<br>▬▬▬▬▬▬▬▬▬▬▬<br><br>**CACI INTERNATIONAL INC.**<br>1100 North Glebe Road,<br>Arlington, Virginia 22201<br><br>**CACI PREMIER TECHNOLOGY, INC.**<br>1100 North Glebe Road,<br>Arlington, Virginia 22201<br><br>**L-3 SERVICES, INC.**<br>1320 Braddock Place<br>Alexandria, VA 22314<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

# COMPLAINT

1.    Sa'adoon Ali Hameed Al-Ogaidi, an Iraqi civilian, was imprisoned and tortured at Abu Ghraib, a prison in Iraq. He brings this tort action against those who tortured, and conspired with others to torture, him: Daniel Johnson, a

Al-Ogaidi v. Johnson et al

Dockets.Justia.com

resident of this District, CACI, and L-3 Services (formerly Titan Corporation), both publicly-traded corporations that made millions of dollars selling the services of Johnson and other employees to the United States military.

## JURISDICTION AND VENUE

2.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1332 (diversity jurisdiction); 28 U.S.C. § 1350 (Alien Tort Statute); and 28 U.S.C. § 1367 (supplemental jurisdiction).

3.     Venue is proper pursuant to 28 U.S.C. § 1391(a)(3) and § 1391(b)(2).

## PARTIES

4.     Plaintiff Sa'adoon Ali Hameed Al-Ogaidi is a thirty-six year old Arabic teacher and shopkeeper who resides in Baghdad. He is an innocent Iraqi who was badly tortured by defendants and their co-conspirators.

5.     Defendant Daniel Johnson is an individual residing at 

6.     Defendant Johnson was employed by Defendant CACI as an interrogator at Abu Ghraib prison from October 2003 to February 2004.

7.     Defendant CACI International Inc. is a publicly-traded Delaware corporation with headquarters located at 1100 North Glebe Road, Arlington,

2

Virginia 22201. Defendant CACI Premier Technology, Inc. is a wholly-owned subsidiary and alter ego of CACI International Inc., and is also located at 1100 North Glebe Road, Arlington, Virginia 22201.

8. CACI received millions of dollars from the United States in exchange for providing the United States Army with services, including interrogation services.

9. Defendant L-3 Services, Inc. is a publicly-traded Delaware corporation with headquarters located at 1320 Braddock Place, Alexandria, Virginia 22314. L-3 employed all the civilian translators used by the military in Iraq, including a man named Adel Nakhla.

10. L-3 received millions of dollars from the United States in exchange for providing the United States Army with services, including translation and interrogation services.

## THE TORTURE OF MR. AL-OGAIDI

11. Mr. Sa'adoon Ali Hameed Al-Ogaidi is married with four children. On or about September 29, 2003, Mr. Al-Ogaidi was forcibly detained during a raid on his home in the middle of the night.

12. Mr. Al-Ogaidi was beaten by the L-3 translator participating in the raid. Mr. Al-Ogaidi was then hooded, cuffed, taken from his home in only his nightclothes, and forced onto the floor of a Hummer.

13.     After a period of time being driven, Mr. Al-Ogaidi was pulled from the Hummer and placed in a cage intended for animals. Mr. Al-Ogaidi was forced to remain awake for several days. Whenever Mr. Al-Ogaidi started to fall asleep, his cage would be rattled and banged with a stick to prevent sleep.

14.     Mr. Al-Ogaidi was transferred from the cage to the Abu Ghraib hard site. Mr. Al-Ogaidi was not given a prison number upon arrival at Abu Ghraib, but instead was illegally treated as a "ghost detainee."

15.     Shortly after his transfer to Abu Ghraib, Mr. Al-Ogaidi was threatened with death. As a co-conspirator put a gun to his head, the L-3 translator stated in Arabic "I am going to kill you."

16.     Mr. Al-Ogaidi was forcefully stripped of his clothes and locked in solitary confinement for a period of time. Mr. Al-Ogaidi was then paraded naked in front of the other prisoners.

17.     Mr. Al-Ogaidi was handcuffed and hung from the bars of his cell, naked.

18.     Mr. Al-Ogaidi was handcuffed through the bars to another prisoner. This was done to prevent either from sleeping because if either man fell asleep, their arms would be pulled, causing such great pain that the other prisoner would be forced to wake them. During this torture, the other prisoner lost consciousness on occasion, causing Mr. Al-Ogaidi tremendous pain.

4

19.     Mr. Al-Ogaidi was taken to an interrogation room where he was kept naked and forced to kneel with his hands cuffed behind his back.  Mr. Al-Ogaidi was beaten and threatened with being sent to Guantanamo Bay by an interrogator and L-3 translator.

20.     Approximately one month after Mr. Al-Ogaidi was imprisoned at Abu Ghraib, he received a visit from the International Committee of the Red Cross ("ICRC" or "Red Cross").   After learning that Mr. Al-Ogaidi did not have a prison number, the ICRC representative promised to send a letter to his family, and ensure that he was given a number.

21.     On the day after Mr. Al-Ogaidi was interviewed by the ICRC, he and the other "ghost detainees" were taken out of their cells, hooded, and shackled together in a chain at the neck, waist and feet.  Mr. Al-Ogaidi and the other ghost detainees were dragged by the chain to another room, and kept there chained together, without being permitted to relieve themselves.  Mr. Al-Ogaidi later learned that they had all been hidden from the ICRC, which had visited the prison again.  The ICRC visits resulted in Mr. Al-Ogaidi being given a number.

22.     On or about December 9, 2004, after more than one year of detention, Mr. Al-Ogaidi was released without having been charged with any crime.

# THE TORTURE CONSPIRACY

23.     Although Mr. Al-Ogaidi was never told the names of his torturers, certain facts about the "hard site" torture of Mr. Al-Ogaidi and other prisoners are known.

24.     The facts known to date show that Daniel Johnson (known as "DJ"), other CACI employees (*e.g.* Steven Stefanowicz (known as "Big Steve") and Tim Dugan), and L-3 employees (*e.g.* Adel Nakhla), conspired with certain military personnel to torture prisoners kept at the Abu Ghraib hard site.

25.     DJ Johnson and other corporate employees instigated, directed, participated in, aided and abetted conduct towards Mr. Al-Ogaidi and other prisoners that clearly violated the Geneva Conventions, the Army Field Manual, and the laws of the United States.

26.     Sworn and unsworn testimony from military personnel who participated in the torture establish that DJ Johnson was one of the interrogators who most frequently directed that certain prisoners be tortured.

27.     DJ Johnson repeatedly used the same specific group of military police to inflict pain on prisoners under his control.   DJ Johnson and his cohort of military police conspirators would repeatedly brag about torturing DJ Johnson's prisoners.

28.     DJ Johnson's co-conspirator Sergeant Ivan Frederick, who was sentenced to eight years in prison for his own participation in the conspiracy, has testified that Johnson once directed him to inflict extreme physical pain on the prisoner by forcing him into a stress position on a chair and pressing his sensitive body parts. Sgt. Frederick, acting at DJ Johnson's direction, also temporarily suffocated the prisoner.

29.     On another occasion, Sgt. Frederick found DJ Johnson's directives to harm the prisoner to be so aggressive that he refused to continue to participate in that particular torture session. DJ Johnson did not stop the torture session, but instead obtained help from different co-conspirators.

30.     During other torture sessions, DJ Johnson instructed co-conspirators to beat harshly the soles of a prisoner's feet and then force him to walk, and threatened prisoners with unmuzzled dogs.

31.     DJ Johnson and his co-conspirators attempted to avoid detection by treating Mr. Al-Ogaidi and other prisoners as "ghost detainees." That term was the conspiracy's code word for those prisoners who were never recorded as having been detained, in order to try to prevent the ICRC from visiting with them and learning of the torture.

32.     Reasonable discovery will establish that DJ Johnson conspired with military personnel to deprive Mr. Al-Ogaidi of sleep, strip him naked, and chain him to the cells bars in painful positions for extended periods of time.

33.     The acts of DJ Johnson and other CACI employees constitute acts of CACI. CACI conveyed its intent to join the conspiracy by making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in conjunction with several co-conspirators.

34.     CACI's motivation was wholly financial -- it made millions of dollars as a result of keeping quiet about and participating in the conspiracy to torture and mistreat Mr. Al-Ogaidi and other prisoners.

35.     DJ Johnson was not the only corporate employee involved in the hard site torture. L-3 translators, including Adel Nakhla, participated at every step along the way, translating threats and in some instances assisting with the physical torture of hard site victims.

36.     The acts of Adel Nakhla and other L-3 translators constitute acts of L-3. L-3 conveyed its intent to join the conspiracy by making a series of verbal statements and by engaging in a series of criminal acts of torture alongside and in conjunction with several co-conspirators.

37.     L-3's motivation was wholly financial -- it made millions of dollars as a result of keeping quiet about and participating in the conspiracy to torture and mistreat Mr. Al-Ogaidi and other prisoners.

## CACI AND L-3 COULD HAVE PREVENTED AND STOPPED THEIR EMPLOYEES FROM TORTURING MR. AL-OGAIDI

38.     DJ Johnson worked for CACI Premier Technology. CACI Premier Technology is an alter ego of CACI International Inc., not a separate fully-capitalized business governed and controlled by independent executives with full autonomy. CACI International Inc. wholly owns and controls CACI Premier Technology, and operates CACI Premier Technology as one of its corporate divisions. CACI International Inc. executives controlled how and whether CACI Premier Technology did business in Iraq.

39.     CACI has admitted that it had the ability to control, direct and influence the actions performed by DJ Johnson and their other employees. CACI had the ability to prevent DJ Johnson and the other employees from torturing Mr. Al-Ogaidi.

40.     Adel Nakhla worked for L-3, as did the other translators who kicked and beat Mr. Al-Ogaidi. L-3's Adel Nakhla has confessed to government officials that he participated in torturing hard site prisoners.

41.    L-3 had the ability to control, direct and influence the actions taken by their employees who directly participated in the torture of prisoners.  L-3 had the ability to prevent Nakhla and the other translators from torturing prisoners.

42.    CACI and L-3 at all times were obliged by the terms of its contract to supervise their employees such as DJ Johnson and Nakhla.

43.    CACI and L-3 at all times retained the ability to stop DJ Johnson, Nakhla and their other employees from torturing Mr. Al-Ogaidi.

44.    CACI and L-3 are responsible for the actions taken by their employees towards Mr. Al-Ogaidi.

## DEFENDANTS AND THEIR CO-CONSPIRATORS TOOK STEPS TO COVER UP THE SCOPE AND EXTENT OF TORTURE

45.    To date, the "investigations" of the events at Abu Ghraib have failed to include the fundamental step of interviewing the hard site victims.

46.    Reasonable discovery will show that, in addition to participating in the actual physical and mental abuse of the Mr. Al-Ogaidi and other prisoners, DJ Johnson, other CACI employees (including but not limited to Steve Stefanowicz and Tim Dugan), Adel Nakhla and other L-3 employees participated in other conspiratorial misconduct, including, but not limited to:

(a)    destroying documents, videos, and photographs,

(b)    preventing the reporting of the torture and abuse to non-conspiring authorities, the ICRC and the media,

10

(c)     hiding Mr. Al-Ogaidi and other prisoners from the ICRC; and

(d)     misleading non-conspiring military and government officials about the state of affairs at the prisons.

## CACI IS ENGAGED IN ONGOING EFFORTS
## TO COVER UP THE TORTURE

47.     CACI has been an ongoing part of this conspiratorial campaign to prevent the truth about the torture, and CACI's participation, from ever being known to the public.

48.     CACI embarked upon a campaign of intimidation to suppress any coverage or investigation of their role in the conspiracy. CACI repeatedly had its lawyers send letters threatening legal action to reporters who were considering reporting on CACI's role in the torture and mistreatment of prisoners.

49.     As part of this campaign of intimidation, CACI brought a frivolous lawsuit against a radio station. CACI lost the lawsuit.

50.     Reasonable discovery will establish that CACI did not anticipate being able to prevail in the lawsuit, but rather brought it in order to intimidate media members who otherwise would have reported more fully on CACI's role in the torture.

51.     CACI has repeatedly made, and continues to make, knowingly false statements to the effect that none of its employees was involved in torturing

prisoners. In fact, co-conspirators have admitted that DJ Johnson and several other corporate employees were involved in the torture.

52. CACI's former Chief Executive Officer has written a book called *Our Good Name*, claiming that CACI has conducted a thorough investigation, and found none of its employees at fault. Based on the description of the investigation found in this book, it appears that CACI's view of a "thorough investigation" is an investigation that fails to include any interviews of the Iraqi torture victims.

53. Nor does the "thorough investigation" include interviews with the CACI employee Torin Nelson, who blew the whistle on the misconduct of his colleagues.

54. The book falsely claims that the publicly-released photographs of torture at Abu Ghraib do not show any CACI employees. In fact, there is a photograph of Johnson interrogating a prisoner in a dangerous and harmful stress position not authorized by the relevant military regulations governing interrogation.

55. Reasonable discovery will establish that CACI consulted with one or more of its co-conspirators during the preparation of this book.

## DEFENDANTS KNEW THAT THEIR TORTURE OF PRISONERS VIOLATED THE LAWS OF THE UNITED STATES

56. DJ Johnson, CACI, and L-3 intentionally and knowingly agreed to and did work in concert with the co-conspirators. To the extent that any particular act was perpetrated by a co-conspirator, DJ Johnson, CACI and L-3 confirmed and ratified the same.

57. Defendants knew that the conspiracy to torture would harm Mr. Al-Ogaidi.

58. CACI and L-3 earned millions of dollars in revenues as a result of participating in the ongoing conspiracy.

59. CACI and L-3 invested the financial fruits of the conspiracy in their ongoing operations.

60. DJ Johnson, CACI, and L-3 knew that military officials were prohibited from torturing prisoners by the Army Field Manual and other controlling law, and that any military officials who were doing so were violating the law.

61. DJ Johnson, CACI, and L-3 knew that the United States government has denounced the use of torture and other cruel, inhuman or degrading treatment at all times. DJ Johnson, CACI and L-3 knew that it was illegal for them to

participate in, instigate, direct, or aid and abet the torture of Mr. Al-Ogaidi and other prisoners.

62.     For example, in its Initial Report to the United Nations Committee Against Torture, the United States Department of State noted that, "[t]orture is prohibited by law throughout the United States.  It is categorically denounced as a matter of policy and as a tool of state authority . . . .  No official of the government, federal, state or local, civilian or military is authorized to commit or to instruct anyone else to commit torture.  Nor may any official condone or tolerate torture in any form." *U.S. Department of State: Initial Report of the United States of America to the U.N. Committee Against Torture, Introduction (1999).* The State Department's Report on Human Rights Practices characterized the following as prohibited forms of torture:  mock executions, sensory deprivation, repeated slapping, exposure to cold, stripping and blindfolding, food and sleep deprivation, threats to detainees or family members, dripping water on the head, squeezing of the testicles, rape and sexual humiliation.

63.     DJ Johnson, CACI, and L-3 knew that the ban on torture is absolute and no exigent circumstances permit the use of torture.

64.     DJ Johnson, CACI, and L-3 knew that the United States intended and required that any person acting under the contract to the United States would conduct themselves in accord with the relevant domestic and international laws.

14

65. DJ Johnson, CACI and L-3 knew and understood that the United States does not condone torture of prisoners.

66. Defendants cannot credibly claim that the wrongful and criminal conduct of certain military and government personnel misled them into thinking that the torture of prisoners was lawful and permissible.

**THE CORPORATE DEFENDANTS ACTED NEGLIGENTLY**

67. CACI acted negligently and wrongfully by failing to prevent DJ Johnson and other employees from engaging in foreseeable and predictable wrongful acts.

68. L-3 acted negligently and wrongfully by failing to prevent Adel Nakhla and other employees assigned to Iraqi detention centers from engaging in foreseeable and predictable wrongful acts.

69. CACI and L-3 acted negligently and wrongfully by failing to discipline those who engaged in wrongful acts in Iraq.

70. CACI and L-3 acted negligently and wrongfully by failing to take due care in hiring employees being deployed to Iraq.

71. CACI and L-3 acted negligently and wrongfully by failing to train their employees.

72. CACI and L-3 acted negligently and wrongfully by failing to supervise adequately their employees. CACI admitted on its web site that CACI

employees in Iraq work under "minimal supervision." L-3 has likewise admitted that it failed to supervise its employees.

73.    CACI and L-3 acted negligently and wrongfully by failing to investigate and report accusations of wrongdoing committed and witnessed by their employees and agents.

74.    CACI and L-3 profited financially from their negligent misconduct. The United States paid CACI and L-3 millions of dollars in exchange for their contractual promises to provide services in a lawful manner.

75.    Instead of providing those services in a lawful manner, CACI and L-3 failed to ensure that their employees and agents abided by the contract terms and in accord with the Geneva Conventions.

76.    DJ Johnson, CACI and L-3 injured Mr. Al-Ogaidi and harmed the reputation of the United States throughout the world.

77.    Mr. Al-Ogaidi seeks compensatory and punitive damages in an amount far in excess of the jurisdictional amount set forth in 28 U.S.C. § 1332 ($75,000).

78.    Mr. Al-Ogaidi seeks any and all additional remedies (such as attorneys' fees) available under law.

## COUNT ONE
## TORTURE

92.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

93.   Defendants' acts and omissions were deliberate and intentional. Defendants acted purposefully to punish, intimidate, discriminate and to obtain information from Mr. Al-Ogaidi, who was in their physical custody and control.

94.   The acts committed by Defendants and their agents constitute torture in violation of the law of nations. The acts of torture committed against Mr. Al-Ogaidi include, among other things, beatings, forced nudity, death threats, withholding of food, water and necessary medical care, and intentional exposure to extremes of heat and cold.  The acts, done by Defendants working under contract with the United States, directly contradicted domestic law and the United States' express policy against torture.

95.   Defendants' misconduct caused grave and foreseeable injuries to Mr. Al-Ogaidi.

## COUNT TWO
## CIVIL CONSPIRACY TO TORTURE

96.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

97. Defendants agreed with each other and others to participate in a series of unlawful acts.

98. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

99. Defendants are liable for torture because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to torture Mr. Al-Ogaidi.

100. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Mr. Al-Ogaidi.

**COUNT THREE**
**AIDING AND ABETTING TORTURE**

101. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

102. Defendants knowingly and substantially assisted others in torturing Mr. Al-Ogaidi.

103. Defendants are liable for the torture because they aided and abetted others who were torturing Mr. Al-Ogaidi.

104. Defendants' substantial assistance caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT FOUR
## CRUEL, INHUMAN OR DEGRADING TREATMENT

105.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

106.   The acts described herein had the intent and the effect of causing serious mental and physical pain and suffering to Mr. Al-Ogaidi, grossly humiliating and debasing Mr. Al-Ogaidi, and forcing him to act against is will and conscience, inciting fear and anguish and breaking his physical or moral resistance.

107.   Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to subject Mr. Al-Ogaidi to cruel, inhuman or degrading treatment.

108.   Defendants are liable for their conduct that led to the cruel, inhuman and degrading treatment of Mr. Al-Ogaidi.

109.   Defendants' misconduct caused grave and foreseeable injuries to Mr. Al-Ogaidi.

## COUNT FIVE
## CIVIL CONSPIRACY TO TREAT PLAINTIFF IN
## A CRUEL, INHUMAN OR DEGRADING MANNER

110.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

111. Defendants agreed with each other and others to participate in a series of unlawful acts.

112. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

113. Defendants are liable for the cruel, inhuman and degrading treatment of Mr. Al-Ogaidi because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to so treat Mr. Al-Ogaidi.

114. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Mr. Al-Ogaidi.

**COUNT SIX**
**AIDING AND ABETTING**
**CRUEL, INHUMAN AND DEGRADING TREATMENT**

115. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

116. Defendants knowingly and substantially assisted others in treating Mr. Al-Ogaidi in a cruel, inhuman and degrading manner.

117. Defendants are liable for the injuries caused by the cruel, inhuman and degrading treatment because they substantially aided and abetted others in so treating Mr. Al-Ogaidi.

118. Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT SEVEN
## WAR CRIMES

119. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

120. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and constitute grave breaches of the Geneva Conventions and war crimes. These acts included torture, cruel, inhuman and degrading treatment, and willfully causing great suffering and serious bodily injury to Mr. Al-Ogaidi.

121. Defendants' acts took place during a period of armed conflict, in connection with hostilities.

122. Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to commit war crimes against Mr. Al-Ogaidi.

123. Defendants are liable for their conduct that constitutes war crimes.

124. Defendants' misconduct caused grave and foreseeable injuries to Mr. Al-Ogaidi.

## COUNT EIGHT
## CIVIL CONSPIRACY TO COMMIT WAR CRIMES

125. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

126. Defendants agreed with each other and others to participate in a series of unlawful acts.

127. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

128. Defendants are liable for war crimes against Mr. Al-Ogaidi because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to commit war crimes against Mr. Al-Ogaidi.

129. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT NINE
## AIDING AND ABETTING COMMISSION OF WAR CRIMES

130. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

131. Defendants knowingly and substantially assisted others in committing war crimes against Mr. Al-Ogaidi.

132.    Defendants are liable for the injuries caused by the war crimes because they substantially aided and abetted others in committing war crimes against Mr. Al-Ogaidi.

133.    Defendants' knowing and substantial assistance to others in the commission of war crimes caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT TEN
## ASSAULT AND BATTERY

134.    All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

135.    Defendants unlawfully intended to and did inflict immediate injury upon Mr. Al-Ogaidi.

136.    Defendants intentionally assaulted, battered and made other offensive contacts; and aided and abetted the assaulting and battering and offensively contacting, of Mr. Al-Ogaidi.

137.    Mr. Al-Ogaidi did not consent to the offensive contacts. Mr. Al-Ogaidi feared his personal safety and felt threatened by Defendants' actions.

138.    Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to commit the assaults and batteries.

139. Defendants' acts caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT ELEVEN
## CIVIL CONSPIRACY TO ASSAULT AND BATTER

140. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

141. Defendants agreed with each other and others to participate in a series of unlawful acts.

142. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

143. Defendants are liable for the assaults and batteries against Mr. Al-Ogaidi because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to commit the assaults and batteries.

144. Defendants' knowing participation in the conspiracy to assault and batter caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT TWELVE
## AIDING AND ABETTING
## ASSAULTS AND BATTERIES

145. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

146.   Defendants knowingly and substantially assisted others in assaulting and battering Mr. Al-Ogaidi.

147.   Defendants are liable for the injuries caused because they substantially aided and abetted others in assaulting and battering Mr. Al-Ogaidi.

148.   Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT THIRTEEN
## SEXUAL ASSAULT AND BATTERY

149.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

150.   Mr. Al-Ogaidi was sexually assaulted and battered by Defendants and their co-conspirators.

151.   Defendants intended to, and did, cause offensive sexual contacts with intimate parts of Mr. Al-Ogaidi.  Defendants acted to cause Mr. Al-Ogaidi imminent apprehension of harmful and offensive contact with his intimate parts.

152.   Mr. Al-Ogaidi did not consent to the contacts. Mr. Al-Ogaidi feared for his personal safety and felt threatened by Defendants' actions.

153.   Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to sexually assault and batter Mr. Al-Ogaidi.

154. Defendants' act caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT FOURTEEN
## CIVIL CONSPIRACY TO SEXUALLY ASSAULT AND BATTER

155. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

156. Defendants agreed with each other and others to participate in a series of unlawful acts.

157. Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

158. Defendants are liable for the sexual assaults and batteries against Mr. Al-Ogaidi  because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to sexually assault and batter Mr. Al-Ogaidi.

159. Defendants' knowing participation in the conspiracy caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT FIFTEEN
## AIDING AND ABETTING
## SEXUAL ASSAULTS AND BATTERIES

160. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

161.   Defendants knowingly and substantially assisted others in sexually assaulting Mr. Al-Ogaidi.

162.   Defendants are liable for the injuries caused by the crimes because they substantially aided and abetted others in sexually assaulting and battering Mr. Al-Ogaidi.

163.   Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT SIXTEEN
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

164.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

165.   Defendants intentionally inflicted severe emotional distress by way of extreme and outrageous conduct on Mr. Al-Ogaidi.  Defendants intended or recklessly disregarded the probability of Mr. Al-Ogaidi suffering emotional distress when directing offensive conduct toward Mr. Al-Ogaidi or carrying out offensive conduct while aware of Mr. Al-Ogaidi's presence.

166.   Defendants set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to inflict emotional distress on Mr. Al-Ogaidi.

167.   Defendants' acts caused grave and foreseeable injuries to Mr. Al-Ogaidi.

## COUNT SEVENTEEN
## CIVIL CONSPIRACY TO INFLICT EMOTIONAL DISTRESS

168.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

169.   Defendants agreed with each other and others to participate in a series of unlawful acts.

170.   Each Defendant performed one or more overt acts pursuant to and in furtherance of the common scheme.

171.   Defendants are liable for intentional infliction of emotional distress on Mr. Al-Ogaidi because they set the conditions, directly and indirectly facilitated, ordered, acquiesced, confirmed, ratified and conspired with others to inflict emotional distress on Mr. Al-Ogaidi.

172.   Defendants' knowing participation in the conspiracy to inflict intentionally emotional distress caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT EIGHTEEN
## AIDING AND ABETTING
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

173.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

174.   Defendants knowingly and substantially assisted others in intentionally inflicting emotional distress upon Mr. Al-Ogaidi.

175.   Defendants are liable for the injuries caused by the intentional infliction of emotional distress because they substantially aided and abetted others in causing the emotional distress to Mr. Al-Ogaidi.

176.   Defendants' knowing and substantial assistance to others caused grave and foreseeable damages to Mr. Al-Ogaidi.

## COUNT NINETEEN – AGAINST THE CORPORATE DEFENDANTS NEGLIGENT HIRING AND SUPERVISION

177.   All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

178.   Defendants acted negligently and directly harmed Mr. Al-Ogaidi by taking or failing to take one or more of the following steps:

(a) failing to take the appropriate steps in hiring proper personnel to perform services;

(b) failing to screen properly personnel before their hiring;

(c) failing to train personnel or subsidiary personnel properly to perform services in a legal fashion;

(d) failing to investigate allegations of torture and abuse carried out by their subsidiaries or their employees;

(e) failing to report to the government allegations of torture and abuse carried out and witnessed by their agents;

(f) failing to adequately supervise and discipline their employees, and

(g) negligently setting the conditions that facilitated the abuse.

179. The negligence of CACI and L-3 directly and foreseeably harmed Mr. Al-Ogaidi.

## COUNT TWENTY –
## AGAINST THE CORPORATE DEFENDANTS
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

180. All preceding paragraphs are hereby incorporated by reference as if fully set forth herein.

181. Defendants negligently inflicted severe emotional distress on Mr. Al-Ogaidi.

182. Defendants had a duty to Mr. Al-Ogaidi, which they breached.

183. The negligence of CACI and L-3 directly and foreseeably harmed Mr. Al-Ogaidi.

## JURY DEMAND AND PRAYER FOR DAMAGES

184. Mr. Al-Ogaidi seeks a jury trial. Mr. Al-Ogaidi is entitled to any and all remedies available to them as a result of the conduct alleged herein, including, but not limited to:

(a)     compensatory damages for physical, mental and economic injuries;

1        (b)    punitive damages in an amount sufficient to punish Defendants

2 for engaging in human rights abuses and deter similar behavior; and

3        (c)    any attorneys' fees and costs permitted by law.

Date: June 30, 2008

                 */s/ Susan L. Burke*
SUSAN L. BURKE
WILLIAM F. GOULD
BURKE O'NEIL LLC
4112 Station Street
Philadelphia, PA 19127
Telephone: (215) 971-5058
Facsimile: (215) 482-0874
E-Mail: sburke@burkeoneil.com

GILBERT H. LEVY, ESQ.
Suite 330, Market Place One
2003 Western Avenue
Seattle, WA 98121
Telephone: (206) 443-0670
E-Mail: gil@glevylawyer.com

KATHERINE GALLAGHER
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor,
New York, NY 10012
Telephone: (212) 614-6455
Facsimile: (212) 614-6499

SHEREEF HADI AKEEL
AKEEL & VALENTINE, P.C.
401 South Old Woodward Avenue,
Suite 430
Birmingham, MI 48009
Telephone: (248) 594-9595

31

Facsimile: (248) 594-4477

*Attorneys for Plaintiff*